IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 23-CR-0031-RK |
| | ) | |
| WYATT C. MAXWELL, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORAND AND
MOTION FOR VARIANCE**

Wyatt Maxwell[1] pleaded guilty in April 2024 to production of child pornography. The parties are jointly recommending a sentence of 240 months' imprisonment and a $10,000 fine, to be followed by no less than 5 years of supervised release. For the reasons set out below, that sentence adequately serves the sentencing factors set out in 18 U.S.C. § 3553(a).

**I. Maxwell faced tragedy and a lack of belonging in their family growing up.**

Maxwell grew up in Harrisonville, Missouri, as the eldest of three children. Their father Chris Maxwell is a family physician, and their mother Rachel was a math teacher and

---

[1] Maxwell is a nonbinary transgender individual who has been diagnosed by a BOP psychiatrist with gender dysphoria. *See* Section IV, *infra*. Maxwell has adopted the name Joy and uses she/they pronouns. They/them pronouns have been used throughout this memorandum for consistency.

church worship leader. Submitted with this memorandum are several letters from family and friends who describe Maxwell as a kind, smart, active young person who showed leadership and musical talent from a young age. They were active in church, show choir, youth theater, debate, and student government.

The Maxwell family was deeply religious. Maxwell attended a Christian school through eighth grade, and many of the choirs and theater programs they were involved in were church-based. Their family thus found it difficult to accept when Maxwell came out as queer in their teenage years. Chris and Rachel Maxwell rejected their child's sexuality and sent them to counseling to "resolve" the issue. Meanwhile, Maxwell struggled to reconcile their lived experience with their faith in God and what they'd been taught about the sinfulness of their identity.



Sadly, while Maxwell was still working through these issues, their mother, Rachel, was diagnosed with an aggressive form of colon cancer. She died just three

weeks after her diagnosis, leaving sixteen-year-old Maxwell in shock. They finished high school, earning high grades as well as numerous scholarships and awards for academic achievement, theater, civic involvement, and citizenship. But the combination of their family's rejection of their identity and their mother's sudden death had resulted in a deep depression. During college, on the third anniversary  of Rachel's death, Maxwell attempted suicide. Three mental-health hospitalizations would follow over a two-year period.

Chris Maxwell, their father, didn't respond well to these struggles. Not long after Rachel's death, he'd become involved with another woman who had six children of her own. A former teacher and mentor of Maxwell's describes the situation:

> [S]he and her family became his dad's top priority. As I viewed the situation, I felt like Wyatt was not valued within the new family unit and his dad gradually pushed him away. Many believe that Wyatt was asked to leave because his father had never accepted his being a gay man. He went home from work one day and found boxes in his room. He was allowed to pack up the boxes and his father gave him $20 for gasoline and told him to leave. My husband and I offered Wyatt a place to stay when this happened, but he chose to live with his Grandmother Mimi, who allowed him to come and live with her. She is a very loving woman who cares greatly for Wyatt. I went over to visit with them while he was there and can attest that it was a very loving place for Wyatt. He would have stayed there longer, but his dad interfered and said that he should not be taking

advantage of his grandmother's hospitality. Soon after, he found a place to live on his own.

While living on their own, Maxwell worked and continued running a nonprofit theater production company they'd begun while living with their grandmother. Then the COVID-19 pandemic struck. Looking to make money online, Maxwell turned to pornography—which eventually led to the offenses in this case.

## II. Neuroscientists, the Sentencing Commission, and courts acknowledge that people who commit offenses prior to their mid-20s—like Maxwell—are both less culpable and more prone to rehabilitation due to the plasticity of their still-developing brains.

The average age of defendants sentenced for child pornography production offenses is 38 years old. U.S. SENT'G COMM'N, *Federal Sentencing of Child Pornography: Production Offenses*, at 18 (2023). By contrast, Maxwell is 25 years old today and was 21 years old at the time of the offense conduct. The sentence in this case should thus consider Maxwell's youth at the time of the offense and how it reflects on both their culpability and capacity for rehabilitation. "The concept of neurological immaturity recognizes that the brain of an individual is not fully developed until approximately the individual's mid-twenties." Eduardo R. Ferrer & Kristin N. Henning, *Critical Clinical Frames: Centering Adolescence, Race, Trauma, and Gender in Practice-Based Pedagogy*, 30 CLINICAL L. REV. 113, at 124 (Fall 2023). The region responsible for executive function—including inhibition control—is the last region to fully develop. *Ibid.* Because of this malleability in youths' brains, young people have a greater capacity for

- 4 -

change than adults, and a delinquent act "most often reflects transitory behavior not the character of the individual who committed the act." *Ibid.*

Similarly, young people do not reach the same psychosocial maturity as adults until around age 25, resulting in their "being more impulsive, more focused on short-term rewards, less averse to risk, and more susceptible to the influence of peers, among other things." *Id.* at 124–25. Young people thus "have diminished decision-making capacity relative to adults, especially when under stress, and, as a result, are less culpable." *Id.* at 125.

Recognizing the "evolving science and data surrounding youthful individuals," the Sentencing Commission recently amended U.S.S.G. § 5H1.1 to provide a basis for downward departures for folks like Maxwell who were "youthful at the time of the instant offense[.]" U.S. SENT'G COMM'N, *Amendments to the Sentencing Guidelines*, at 25 (April 30, 2024).[2] The amendment, which went into effect on November 1, 2024, provides:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf (last accessed July 1, 2024).

> impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.
>
> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

U.S.S.G. § 5H1.1 (2024).

With this departure provision, the Commission is specifically concerned with people like Maxwell, whose offense took place before their mid-20s. Adverse experiences and difficult familial relationships had a significant impact on Maxwell's development in the years leading up to this offense. By the same turn, though, Maxwell has shown the capacity for change and rehabilitation that comes with youth, dedicating themselves to treatment programming while in pretrial custody and making plans for living a law-abiding life upon release. The sentence imposed should thus account for the neuroscientific realities of this case, which speak both to Maxwell's diminished culpability and their potential for redemption and reform.

**III. Sentencing statistics suggest the guideline range applicable to Maxwell's offense is greater than necessary to serve the statutory goals of sentencing and that the 240-month sentence recommended by the parties is the appropriate one in this case.**

The advisory range calculated by the presentence report is 324–360 months. But sentencing data increasingly suggest district judges find the guideline ranges for production offenses to be poor approximations of what is sufficient, but not greater than necessary. "The rate of within-range sentences for offenders sentenced under §2G2.1 has decreased steadily since fiscal year 2005, from 83.3 percent to 30.7 percent in fiscal year 2019." U.S. SENT'G COMM'N, *Federal Sentencing of Child Pornography: Production Offenses*, at 22 (2023) (hereinafter "Production Offenses Report"). Over the last five fiscal years, an average of 63 percent of defendants sentenced pursuant to § 2G2.1 nationwide were sentenced below the guidelines. U.S. SENT'G COMM'N, *Interactive Data Analyzer.*[3] In the Western District of Missouri, that five-year average is *75 percent. Ibid.* Guideline sentences in production cases are by far the exception, not the norm.

The average sentence across all production cases in fiscal year 2019 was 275 months—just shy of 23 years. *Production Offenses Report*, at 3. But average sentences vary depending on several factors. For example, offenders who met their victims online received an average sentence of 249 months, while teachers, relatives, and

---

[3] Available at https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed Nov. 12, 2024).

- 7 -

parents who perpetrated production offenses received higher average sentences that correlated to their degree of closeness to the victim (274–340 months). *Id.* at 45. Average sentences also increased as the age of the victim decreased: offenses involving teenage victims received shorter average sentences (232 months) than those involving younger victims (292–364 months). *Id.* at 46. These data suggest the 240-month sentence recommended by the parties aligns with sentences imposed for similar offenses nationwide.

Sentencing Commission data further confirms the parties' proposal avoids unwarranted disparities among similarly situated defendants: During the last five fiscal years, the nationwide average sentence for defendants sentenced pursuant to § 2G2.1 with a final offense level of 40 and a criminal history category of I was 248 months. U.S. SENT'G COMM'N, Judiciary Sentencing Information (JSIN).[4] And in the Western District of Missouri, the average sentence imposed for a § 2G2.1 offense was 237 months in fiscal year 2023. U.S. SENT'G COMM'N, *Interactive Data Analyzer*, *supra*.[5]

The twenty-year sentence proposed here is lengthy, especially for someone in their mid-twenties like Maxwell. It conveys the severity of the offense, promotes

---

[4] Available at https://jsin. ussc.gov/analytics/saw.dll?Dashboard (last accessed Nov. 12, 2024).

[5] Notably, of the 80 cases reported from the Western District of Missouri over the last 5 fiscal years, a fine was imposed in just 2 of them—a fact the Court can consider in determining whether the total punishment proposed by the parties is adequate. *Ibid.*

respect for the law, and is sufficient to deter Maxwell and others. At the same time, it accounts for Maxwell's age, background, and the unique challenges they will face as a transgender person in prison, which are discussed more fully below.

## IV. Maxwell faces disproportionate hardship as a transgender inmate in the Bureau of Prisons.

Maxwell's status as a transgender individual means they will face greater hardships in the Bureau of Prisons than the average inmate. Last year, a BOP psychiatrist diagnosed Maxwell with gender dysphoria. *PSR at ¶ 75*.[6] Gender dysphoria is "clinically significant distress" in social, occupational, or other areas of function due to an incongruence between one's gender identity and their assigned sex. AM. PSYCHIATRIC ASS'N, DSM-5 451–53 (5th ed. 2013). Maxwell began hormone replacement therapy this spring under the care of a BOP physician. *PSR at ¶ 75*. Whether that care will continue, though, is uncertain.

Certain protections for transgender inmates are guaranteed by the Eighth Amendment's prohibition against cruel and unusual punishment. Nonetheless, the first Trump Administration's "conservative appointees at the bureau did take some significant steps to reverse other policies related to transgender inmates." Glenn Thrush, *Under Trump, U.S. Prisons Offered Gender-Affirming Care*, N.Y. TIMES, Oct. 16, 2024. This included changing treatment guidelines to create higher barriers to gender-

---

[6] Maxwell's BOP medical records have been provided to the probation office since completion of the presentence report and can be filed under seal if the Court so desires.

affirming care, as well as rolling back Obama-era policies that allowed inmates to be assigned housing based on their gender identity rather than assigned sex at birth, once certain conditions were met. *Ibid.* Although the Biden Administration restored the pre-Trump policy, it appears likely the tide will again turn with the changeover in January: in the two months preceding the election, Trump's campaign spent about $35 million on ads related to transgender issues, including ads assailing access to medical care for transgender inmates. Bill Barrow, *Trump and Vance make anti-transgender attacks central to their campaign's closing argument*, ASSOCIATED PRESS (Nov. 1, 2024).

Even if Maxwell continues receiving gender-affirming care, that is not the end of the difficulties presented within the Bureau of Prisons. "Transgender inmates are among the most vulnerable people in the roughly 145,000-person federal system[.]" Thrush, *supra*. Incarcerated transgender people face denial of medically necessary care, punishment for attempts to transition through their gender expression, sexual victimization, and outright disregard from prison officials. Richard Saenz, AMER. BAR ASS'N, *A Crisis Behind Bars: Legal Issues Impacting Transgender People*, 38 Crim. Just. 3, at 5 (Winter 2024). Indeed, "[f]rom 2020–2022, Lambda Legal received over 1,000 calls for help from incarcerated people. Of those, almost 40 percent were from transgender or nonbinary people." *Ibid.* Transgender folks are at a heightened risk for sexual assault in prison, and "research demonstrates that once an incarcerated transgender person has been a victim of sexual assault, they are more likely to experience further assaults." *Id.* at 6–7.

Notably, Maxwell has met these concerns and uncertainties head on. They have used their time in pretrial custody to familiarize themselves with the BOP's current Transgender Offender Manual and to advocate for and participate in relevant programming, including the Emerging Identities Support Group and the Stronger Together Emerging Proud program. And when it unfortunately became necessary, they reported harassment and sexual assault experienced while in pretrial custody.

Considering the foregoing, Maxwell respectfully requests the Court make two recommendations in the judgment. First, Maxwell requests the Court recommend that the Transgender Executive Council review Maxwell's case during the designation process. The TEC is the BOP's "official decision-making body on all issues affecting the transgender population" and meets at least quarterly to "offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with GD, including training, designation issues, and reviewing all transfers for approval." BUREAU OF PRISONS, *Transgender Offender Manual*, Prog. Statement 5200.04, at 4 (Jan. 2022). When the TEC receives information—including via court order—that an individual entering their custody is transgender, designations staff refers the matter to the TEC. *Id.* at 5–6. The TEC then considers an array of factors in determining an appropriate designation and explores options for mitigating risk to the inmate, including "cell and/or unit assignments, application of management variables, programming missions of the facility, and security of the institution." *Id.* at 6.

Second, Maxwell asks that the Court recommend designation to the closest appropriate facility that offers sex offender treatment programming. For clients who are sex offenders, the Bureau often requires the client complete sex offender treatment in order to receive gender-affirming care. For the average inmate, though, sex offender treatment is often delayed until closer to the inmate's release date, resulting in initial designation to a facility that may not offer that programming. This requested recommendation seeks to avoid that situation, which could jeopardize Maxwell's ongoing care.

\* \* \*

The jointly recommended 240-month sentence serves as significant punishment and deterrence for Maxwell, who has no criminal history and has never spent time in jail or prison prior to this offense. By the same token, it accounts for their difficult life history, youth, the challenges they face as a transgender person in prison, acceptance of responsibility, and issues with the guideline governing the offense. In short, it is a sentence that sufficiently serves the sentencing statute's goals. Maxwell therefore requests the Court sentence them to 240 months' imprisonment, a $10,000 fine, and ten years of supervised release. They respectfully request the Court recommend the BOP's Transgender Executive Council review their case during the designation process and further recommend designation to the nearest appropriate facility that offers sex offender treatment.

Respectfully submitted,

 /s/ Chelsea Wilson
Chelsea Wilson
Assistant Federal Public Defender
1000 Walnut, Suite 600
Kansas City, Missouri 64106
(816) 471-8282

## CERTIFICATE OF SERVICE

I certify the foregoing was filed and served using the CM/ECF system on November 14, 2024.

 /s/ Chelsea Wilson
Chelsea Wilson